# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

_____
                                    )
In re:                              )          Case No. 09-51260-SCS
                                    )
SHAWN L. COBB,                      )
JACQUELINE A. SHORT,                )
                                    )
        *Debtors*.                  )          Chapter 13
_____)

## MEMORANDUM OPINION

This matter came on for hearing on March 19, 2010, on the objection of Shawn L. Cobb

("Cobb") and Jacqueline A. Short ("Short") to the claim of the Internal Revenue Service of the

United States (the "IRS") for $55,993.59 in delinquent employment withholding taxes and the

objection of the IRS to the Chapter 13 Plan filed by Short in this case. The objection sought denial

of the claim of the IRS on the grounds that Short was not a responsible person pursuant to 26 U.S.C.

§ 6672 and she did not willfully fail to pay the withholding taxes in question. The Court has

jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments

presented by counsel and the pleadings submitted, the Court makes the following findings of fact

and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### I. Procedural History

Cobb and Short commenced this Chapter 13 case by filing a joint voluntary petition on

August 6, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the Eastern District

of Virginia. The proceeding was designated as Case No. 09-51260-SCS. On August 21, 2009, Cobb

and Short filed schedules A-J as required by 11 U.S.C. § 521, Federal Rule of Bankruptcy Procedure

1007, and Local Bankruptcy Rule 1007-1. Schedule E, entitled "Creditors Holding Unsecured

Priority Claims," listed the IRS as being owed "$0.00."  Schedule E indicates that the IRS was listed

as an unsecured priority creditor for "notice purposes only."  The potential claim of the IRS was also

designated by a "W," indicating Short's potential liability if any claim were found to exist.  Also on

August 21, 2009, Cobb and Short filed their Chapter 13 Plan (the "Plan").  The Plan makes no

provision for the payment of any monies to the IRS by virtue of unpaid taxes.  The IRS filed Proof

of Claim Number 8 dated August 28, 2009, listing $55,993.59 in priority tax claims (the "Claim").

On October 16, 2009, the IRS filed an objection to confirmation of the Plan (the "IRS Objection"),

asserting that "[t]he plan fails to adequately provide for the payment of the IRS's priority tax claim

as required by [Bankruptcy Code] Section 1322(a)(2)," and further contending that "[t]he IRS's

priority tax claims total $55,993.59, and the plan does not provide for any payment toward such

claims." IRS Objection ¶ 2.

## A. The Short Objection

Cobb and Short objected to the Claim on November 2, 2009 (the "Short Objection").  The

Short Objection provides the bases for Short's denial of liability for the employment withholding

taxes:

"3.  This claim is for the payment of income withholding taxes for a Virginia Corporation,

Diversified Services, Inc., in which the debtor served as an officer in name only." Short Objection

¶ 3.

"4.  The debtor served as a manager of the daily operations of the convenience stores owned

by the corporation, for which payment of withholding taxes was not within her authorized duties."

*Id.* ¶ 4.

"5.  The owner and co-officer, Patrick Smith (which is not a debtor in the above bankruptcy

case) of this corporation has acknowledged responsibility for this debt in the form of acceptance of

2

a lien against his own real property and the establishment of a payment plan to the Internal Revenue Service." *Id.* ¶ 5.

"6.  The debtor has not been a party to the aforementioned agreement of lien in any manner, nor has the debtor acknowledged liability for the tax debt in any manner." *Id.* ¶ 6.

"7.  Debtor, Jaqueline A. Short bears no responsibility for the debt owed to the Internal Revenue Service on behalf of the aforementioned Virginia Corporation, as she was nothing more than a mere employee of the aforementioned company without the authority to pay the withholding taxes in question." *Id.* ¶ 7.

"8.  Pursuant to United States Code 26 USC 6672, 'any officer or employee of a corporation who is responsible for the collection or payment of federal employment taxes who willfully fails to pay such taxes is liable for a penalty equal to the unpaid amount.'" *Id.* ¶ 8.

"9.  Debtor states that at no time during her employment was she ever given authority by the entity or its officers to pay the income withholding taxes beyond possibly endorsing checks made payable to the IRS for which the directors of the corporation had authorized prior to her endorsement." *Id.* ¶ 9.

"10.  Debtor states that without the aforementioned authority it was impossible for her to willfully fail to pay the corporation tax debt in question and further adds that the lack of this authority results in the Internal Revenue Services [*sic*] claim as filed being void *ab initio* as to the debtor.  See *Harris v. United States*, No. 97-5180, (May 1999)." *Id.* ¶ 10.

"11.  As a result, it is only proper that the claim filed in the debtor's case by the Internal Revenue Service be denied by this Honorable Court." *Id.* ¶ 11.

For the reasons contained in the Short Objection, Short believes the Claim should be denied and that the Plan should be confirmed over the IRS Objection.  At the request of the IRS, a pre-trial

3

conference was conducted by the Court on December 11, 2009. As a result of the conference, March 19, 2010, was established as the date for the hearing on the Short Objection to the Claim and the IRS Objection to plan confirmation.

### B. The Factual Stipulation

Short and the IRS entered into an extensive factual stipulation ("Stipulation") prior to the March 19, 2010, hearing:

"1.  Diversified Business Company, Inc., ('DBCI') operated several gas stations with adjoining auto repair and convenient stores in the Newport News and Williamsburg areas of Virginia.  DBCI also operated an auto parts store." Stipulation ¶ 1.

"2.  DBCI was founded by Emmitt Short ('Emmitt'), who served as president and CEO of DBCI.  DBCI's shares were owned by Emmitt, Patrick Smith ('Smith'), and Father Stan Martinka. Emmitt owned 49%, Smith owned 49%, and Martinka owned 2%." *Id.* ¶ 2.

"3.  Emmitt hired Smith in 1978." *Id.* ¶ 3.

"4.  Smith was promoted to vice president in the late 1980s and shared management responsibilities for the entire company with Emmitt until Emmitt retired." *Id.* ¶ 4.

"5.  DBCI later expanded its business to franchise Blimpie sandwich shops, which was managed by Smith." *Id.* ¶ 5.

"6.  In the 1990s, Ann Short, Emmitt's wife, worked for DBCI as comptroller, and Nancy Short, Emmitt's daughter, worked for DBCI as administrative manager and vice president." *Id.* ¶ 6.

"7.  The debtor, Jacqueline Short ('Jackie'), also Emmitt's daughter, worked for DBCI from 1985." *Id.* ¶ 7.

"8.  Kathy Roache ('Roache') worked for the DBCI's business office as an administrative assistant from 1990 to mid-2003." *Id.* ¶ 8.

"9.  When Emmitt retired in 1995, Smith was promoted to president of DBCI by Emmitt." *Id.* ¶ 9.

"10.  DBCI filed for Chapter 11 bankruptcy in 1996, Case No. 96-41913-DHA, and its bankruptcy was terminated in 1997." *Id.* ¶ 10.

"11.  Jackie started at DBCI as an accounts-receivable clerk in the 1980s but was eventually promoted to a store manager, and then to an area manager overseeing multiple gas stations." *Id.* ¶ 11.

"12.  In 2000, Jackie became vice president of DBCI." *Id.* ¶ 12.

"13.  From 2000 onward, JW Thomas Company (a/k/a 'EK Williams' or 'Marcoin') handled DBCI's accounting work, including the preparation of tax documents, profits and loss statements, general ledger, and balance sheets." *Id.* ¶ 13.

"14.  Elizabeth Burton ('Burton') of JK Thomas Company[1] mainly handled DBCI's account." *Id.* ¶ 14.

"15.  Burton's contacts at DBCI were Roache (until she left DBCI in mid-2003), Jackie, and Smith." *Id.* ¶ 15.

"16.  On monthly basis, Burton met with Smith, and occasionally Jackie would attend the meetings as well." *Id.* ¶ 16.

"17.  In 2003, Donna Geary ("Geary") of JK Thomas Company began preparing DBCI's payroll checks and payroll statements." *Id.* ¶ 17.

"18.  Geary's main contact at DBCI was Jackie." *Id.* ¶ 18.

"19.  Between 2001 and 2004, only Jackie and Smith had the check signing authority for

---

[1] Despite the fact that the accounting firm is referred to in the Stipulation by at least four different names, it appears uncontroverted that all references are to the same accounting firm.  In any event, this fact has no material effect on the adjudication and outcome of the instant matter.

DBCI's corporate checking accounts at Old Point National Bank." *Id.* ¶ 19.

"20.  From 2001, only Roache, Jackie, and Smith worked at DBCI's business office.  In 2001, DBCI's business office was at a separate location from DBCI's gas stations." *Id.* ¶ 20.

"21.  Between 2001 and 2004, Jackie hired DBCI's employees." *Id.* ¶ 21.

"22.  Between 2001 and 2004, Smith and Jackie met daily, either in person or telephonically, and discussed DBCI's finances including which creditors should be paid." *Id.* ¶ 22.

"23.  Between 2001 and 2004, Jackie signed over 90% of DBCI's checks." *Id.* ¶ 23.

"24.  Between 2001 and 2004, Jackie regularly met with vendors including those for beer, grocery, and cigarettes on behalf of DBCI." *Id.* ¶ 24.

"25.  DBCI has operated as many as 15 gas stations at its peak." *Id.* ¶ 25.

"26.  In 2003, DBCI ceased operating the gas stations at Coliseum Shell and Armistead Citgo." *Id.* ¶ 26.

"27.  In 2004, DBCI operated only one gas station at Newport Square Exxon and no longer had a separate business office for Jackie and Smith." *Id.* ¶ 27.

"28.  DBCI closed its last gas station at Newport Square Exxon in September 2004." *Id.* ¶ 28.

"29.  While DBCI was delinquent with its employment tax payments between 2001 and 2004, it continued to withhold income and employment taxes from its employees' wages." *Id.* ¶ 29.

"30.  Jackie was aware of DBCI's employment tax deficiencies no later than 2002." *Id.* ¶ 30.

"31.  Jackie was assessed with the Trust Fund Recovery Penalties ('TFRP') for the trust fund portions of DBCI's unpaid employment taxes on February 6, 2006, for the following tax periods and amounts:"[2]

---

[2] The chart reflects the Court's re-creation of that contained in the Stipulation filed by the parties on March 12, 2010.

| Tax Periods | TFRP Amount | Interest as of date of bankruptcy petition |
|---|---|---|
| 12/31/2001 | $21,807.00 | $3,191.40 |
| 09/30/2002 | $8,849.41 | $2,335.91 |
| 12/31/2002 | $10,994.79 | $2,902.20 |
| 03/31/2003 | $5,588.32 | $1,475.10 |
| 06/30/2003 | $1,755.00 | $463.26 |
| 09/30/2003 | $2,900.00 | $765.48 |
| 12/31/2003 | $2,213.00 | $584.14 |
| 09/30/2004 | $2,133.44 | $563.14 |
| **TOTAL** | **$56,240.96** | **$12,280.63** |

*Id.* ¶ 31.

"32.  On August 6, 2009, Jackie filed a chapter 13 bankruptcy petition commencing the present bankruptcy case jointly with her husband, Shawn L. Cobb." *Id.* ¶ 32.

"33.  On August 29, 2009, The Internal Revenue Service filed a proof of claim in this bankruptcy case for $55,993.59[3] as an unsecured priority claim for the TFRP assessed against Jackie and statutory interest accrued until August 6, 2009, the date of bankruptcy petition." *Id.* ¶ 33.

## II. The Evidence at Trial[4]

At the hearing on March 19, 2010, Short testified at length regarding her employment with DBCI.  Her testimony exhaustively described the duties she performed there prior to 2000.[5]  In that

---

[3] No explanation was provided regarding the difference in the amount of the IRS's proof of claim and the total amount of the Trust Fund Recovery Penalties assessed against Short.

[4] The exhibits of the IRS were admitted without objection.  Short did not proffer any exhibits.

[5] Inasmuch as the applicable time period for the IRS claim against Short commences in 2001, an examination of Short's duties at DBCI prior to 2000 provides little relevance except for

year, she became the sole Vice President of DBCI.[6]  As such, she worked closely with Roache, who

was responsible for clerical duties associated with DBCI's accounts payable and accounts receivable.

Short stated that she undertook no responsibility for handling tax matters in the course of her

employment as Vice President.  Roache departed her employment with DBCI in late 2002 or early

2003.  Short testified that prior to that time, Smith decided which bills would be paid, leaving no

discretion to Short for rendering such determinations.

In early 2002, after an absence due to her maternity leave and before Roache's departure from

the company's employment, Short became aware of DBCI's delinquency in the payment of

withholding taxes to the IRS.[7]  Burton, an employee of DBCI's accounting firm, advised Short that

because Short signed payroll checks, Short could be personally liable for payment of the withholding

taxes.  Short additionally inquired of Smith "quite a bit" about the taxes.  In response, Smith stated

he was working with the IRS and that "he had taken care of it."

After speaking with Smith, and owing to her confidence in DBCI's ability to ultimately pay

the taxes, Short appears to have been unconcerned about her potential personal liability for the same.

Short stated she was a signatory on the Old Point National Bank checking accounts held by DBCI,

but she contends that from 2001 to 2002 she did not enjoy discretion as to which of the company's

checks she would sign.  Short also testified that she never lent money to DBCI nor did she negotiate

or sign leasehold agreements on behalf of the organization.

---

the provision of some historical perspective.

[6] Short testified that prior to 2000 she was "Vice President of Marketing."

[7] The exact date of Short's alleged discovery of the delinquency of payment of withholding taxes is unclear.  In an interview with an IRS agent in 2004, she answered that she became aware of the delinquency in "late summer 2001." IRS Exh. 104, Report of Interview for Short, at 5.  On cross-examination by the IRS, Short admitted that her discovery of the failure of DBCI to pay withholding taxes could have been "in 2001 or prior."

8

Upon Roache's departure from DBCI, Short undertook preparation of the company's accounts payable on a monthly basis. In doing so, Short would make a list of payments due before discussing them with Smith. The IRS appeared on these lists. Short testified that although she physically transported several payments to the bank so that creditors would be paid, she was unaware of whether the payments remitted were in full or partial satisfaction of the company's debts. Short also testified that she did no hiring or firing of employees after Roache's departure from the company, as DBCI's downsizing rendered such practices unnecessary. Further, Short stated that she had no authority to fire the company's accountants. In 2004, when DBCI ceased its business operations, Short's employment with the company came to an end.

On cross-examination by the IRS, Short admitted she had check signing authority for all accounts of DBCI, without dollar limitation or necessity for a co-signor. Short agreed she had signed at least ninety percent (90%) of all the checks of DBCI, including payroll checks. Short was the second highest compensated employee of DBCI, behind only Smith. After Roache's departure, Short had full responsibility for all payroll functions of DBCI, and from 2001 through the cessation of its business in 2004, Short oversaw all of the operations of the convenience stores of DBCI. Short spoke at least once daily with Smith about the business operations of DBCI.

Roache testified she became aware of the withholding tax delinquencies when Short brought the arrears to Roache's attention. Roache also testified to having overheard conversations between Smith and Short during which they were "discussing the bills." Roache explained that when bills arrived requesting payment from DBCI, Roache would place them on a table in the company's office. Roache additionally testified that when Smith was not at DBCI, Short would make the necessary business decisions. Roache also noted that Short had the authority to hire and fire at the store level,

9

although Short did not fire any store managers while Roache was employed at DBCI.[8]

Smith's testimony was succinct. He stated he was President of DBCI from 2000 to 2004. Smith testified that Short had the ability to hire and fire employees without limitation, including store managers, that Short enjoyed check writing authority unlimited in dollar amount, and that Short signed most of DBCI's checks. Smith and Short did not generally discuss which vendors to pay, as the agreed primary business concern was that invoices made by the companies furnishing gas to the convenience stores would be paid on presentation, as maintenance of gas inventories was essential to the operations of DBCI. Smith and Short did discuss the employment taxes of DBCI, and both believed the only way to cure the delinquency in payments was through the restoration of profitable business operations.

According to Smith, Short had significant influence on the decisions of DBCI. In his view, he and Short were "partners trying to reach a mutual goal." Smith also stated he and Short reviewed the company's profit and loss statements and discussed whether the withholding taxes should be paid. Smith also explained that he and Short had always agreed on which convenience stores to close. According to Smith, Short had no involvement with purchasing or leasing new convenience store locations because those decisions had been made by Emmit prior to his retirement. During Short's tenure as Vice President, no new locations were acquired or developed. As DBCI's business slowed, employees were moved from closed locations to those remaining operational.

### III. Conclusions of Law

Judge Motz has recently chronicled the requirements of the Internal Revenue Code concerning an employer's obligations to withhold taxes:

---

[8] Burton testified concerning Short's inquiry to her regarding her personal liability for the failure to pay the withholding taxes. Burton's testimony provided little other insight.

> The Internal Revenue Code requires employers to withhold social security and federal excise taxes from their employees' wages. *See* 26 U.S.C. §§ 3402(a), 3102(a) (2006); *Plett v. United States*, 185 F.3d 216, 218 (4th Cir. 1999). The employer holds these monies in trust for the United States. 26 U.S.C. § 7501(a) (2006). Accordingly, courts often refer to the withheld amounts as "trust fund taxes"; these monies exist for the exclusive use of the government, not the employer. *See Plett*, 185 F.3d at 218. Payment of these trust fund taxes is "no[t] excuse[d]" merely because "as a matter of sound business judgment, the money was paid to suppliers . . . in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business." *Collins v. United States*, 848 F.2d 740, 741-42 (6th Cir. 1988).

*Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010). "'The 'trust fund taxes' are for the exclusive use of the Government and are not to be used to pay the employer's business expenses, including salaries, or for any other purpose.'" *Milchling v. United States*, Case No. JFM 07-0237, 2009 WL 2032157, at *2 (D. Md. July 7, 2009) (citing *Johnson v. United States*, 203 F. Supp. 2d 416 (D. Md. 2002) (quoting *Gephart v. United States*, 818 F.2d 469, 472 (6th Cir. 1987))).

The ability to ensure compliance with these requirements to withhold are also described by Judge Motz:

> The [Internal Revenue] Code "assure[s] compliance by the employer with its obligation . . . to pay" trust fund taxes by imposing personal liability on officers or agents of the employer responsible for "the employer's decisions regarding withholding and payment" of the taxes. *Slodov v. United States*, 436 U.S. 238, 247 (1978) (interpreting 26 U.S.C. § 6672 (2006)). To that end, § 6672(a) of the Code provides that "[a]ny person required to collect, truthfully account for, and pay over any tax . . . who willfully fails" to do so shall be personally liable for "a penalty equal to the total amount of the tax evaded, or not . . . paid over." 26 U.S.C. § 6672(a). Although labeled as a "penalty," § 6672 does not actually punish; rather, it "brings to the government only the same amount to which it was entitled by way of the tax." *Turnbull v. United States*, 929 F.2d 173, 178 n.6 (5th Cir. 1991) (internal quotation marks omitted).

*Erwin*, 591 F.3d at 318. Not all officers and agents of an employer may be held personally liable for payment of trust fund taxes. Only officers and agents who have assumed responsibility for ensuring those taxes are paid may be found answerable to the IRS when the failure to make such payment is

11

willful.

> Personal liability for a corporation's trust fund taxes extends to any person who (1) is "responsible" for collection and payment of those taxes, and (2) "willfully fail[s]" to see that the taxes are paid. *Plett*, 185 F.3d at 218; *O'Connor v. United States*, 956 F.2d 48, 50 (4th Cir. 1992). Once the Government assesses a taxpayer for this liability, the taxpayer has the burden of proof at trial on both elements of § 6672 liability. *See O'Connor*, 956 F.2d at 50.

*Id.*[9]

Despite the statutory language, the term "responsible person" is not restricted to a single

person:

> Although the Code defines a responsible person as one "required to collect, truthfully account for, *and* pay over any tax," 26 U.S.C. § 6672(a) (emphasis added), the Supreme Court has interpreted this language to apply to all "persons responsible for collection of third-party taxes and not . . . [only] to those persons in a position to perform all three of the enumerated duties." *Slodov*, 436 U.S. at 250. Thus, the Code deems anyone required to "collect" *or* "account for" *or* "remit" taxes a "responsible person" for purposes of § 6672. *See Plett*, 185 F.3d at 219.

> More than one person may be held responsible for a corporation's payroll taxes. Indeed, "[t]he term 'responsible person' is broad and may include many individuals connected with a corporation." *O'Connor*, 956 F.2d at 50; *see also Barnett v. I.R.S*, 988 F.2d 1449, 1445 (5th Cir. 1993) ("[T]here usually are . . . multiple responsible persons in any company."). Assessing whether a "person has the statutorily imposed duty to make the tax payments" constitutes the "key element" in determining responsible person status. *O'Connor*, 956 F.2d at 51. "This duty is considered in light of the person's authority over an enterprise's finances or general decision making[,] . . . [and] is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursement of funds." *Id.* (citation omitted).

*Id.* at 320. Finally, the Fourth Circuit Court of Appeals has instructed as to the considerations that

---

[9] Section 6672(a) of Title 26 of the United States Code, which includes the Internal Revenue Code, provides as follows: "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. . . ." 26 U.S.C. § 6672(a).

should be employed by the court in assessing whether liability for withholding taxes attaches to an

individual:

> Titular authority alone does not establish responsible person status. Rather, the proper inquiry focuses "on substance rather than form" (citing *O'Connor*, 956 F.2d at 51). "The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, or is under a duty to do so, before that officer can be deemed to be a responsible person." *Id.* Put another way, the essential inquiry is whether a person has significant, but not necessarily exclusive, authority over corporate finances or management decisions.

*Id.* To facilitate this analysis, the Fourth Circuit Court of Appeals provides an instructive elemental

framework:

> We have developed a non-exhaustive list of factors to consider in determining whether "the substance of the circumstances" establishes responsible person status under § 6672. Thus, we examine whether the employee (1) served as an officer or director of the company; (2) controlled the company's payroll; (3) determined which creditors to pay and when to pay them; (4) participated in the corporation's day-to-day management; (5) had the ability to hire and fire employees; and (6) possessed the power to write checks. No single factor controls; rather, we consider the "totality of the circumstances."

*Id.* at 320-21 (internal citations omitted). Once assessment takes place, the burden falls to the

taxpayer:

> [I]t is "well established in tax law that an assessment is entitled to a legal presumption of correctness." *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242, (2002). In other words, in the context of § 6672, an IRS determination of tax liability is presumptively correct and the burden is placed on the taxpayer to establish that the IRS's determination was erroneous. *See United States v. Pomponio*, 635 F.2d 293, 296 (4th Cir. 1980). In order to show that an IRS determination was erroneous, a taxpayer must demonstrate either (1) that he was not a responsible person, or (2) that his failure to pay the taxes was not willful. *Id.*

*Johnson v. United States*, Case No. L-06-350, 2010 WL 170376, at *3 (D. Md. Jan. 14, 2010). *See*

*also Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir. 1990) ("The individual against whom the

assessment is made bears the burden of proving by a preponderance of the evidence that one or both

of these elements is not present.").

13

A. Is Short a "Responsible Person?"

The decision as to whether Short is a "responsible person" within the meaning of the Internal Revenue Code turns upon which characterization of Short's duties is most accurate: was she a "partner" as described by Smith, or an "officer in name only" with limited operational authority as advocated by Short?  A review of all of the circumstances here indicates Short was a "responsible person" for the purposes of the Internal Revenue Code § 6672(a).

Application of the factors expounded in *Erwin* to the evidence here indicates Short held "responsible person" status under § 6672 with respect to DBCI's payroll taxes.  As to the first factor, it is undisputed that Short was an officer of DBCI, serving as Vice President for the entire time during which DBCI failed to pay its payroll taxes. Stipulation ¶ 12.[10]  Short was one of only two corporate

---

[10] Much of Short's testimony at the hearing consumed attempts to either vary or ameliorate the Stipulation entered into by Short and the IRS.  However, the effect of a trial stipulation is certain and binds the parties thereto.  The purpose of factual stipulations at trial has been recognized by Judge Ellis:

> The primary purpose of entering into a stipulation is "to dispense with proof over matters not in issue, thereby promoting judicial economy at the convenience of the parties."  *United States v. Montgomery*, 620 F.2d 753, 757 (10th Cir. 1980) (citing 9 J. Wigmore, Evidence §§ 2588-2597 (3d ed.1940)); *see also CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999) (recognizing that "stipulations serve both judicial economy and the convenience of the parties").  It has therefore been held that "[s]tipulations as to facts freely and voluntarily entered into during trial are equivalent of proof and . . . neither party will be heard to suggest that the facts were other than as stipulated."  *United States v. Campbell*, 453 F.2d 447, 451 (10th Cir. 1972).  Indeed, courts "enforce stipulations as a general rule, absent circumstances tending to negate a finding of informed and voluntary assent of a party to the agreement."  *United States v. McGregor*, 529 F.2d 928, 931 (9th Cir. 1976) (citation omitted).

*U.S. v. Lentz*, 419 F. Supp. 2d 843, 844-45 (E.D. Va. 2006).

The binding effect of a factual stipulation on the parties at trial has been recognized by the Fourth Circuit Court of Appeals:

14

officers. Contrary to her assertions, she played a substantial role in the operations of DBCI.

With respect to the second factor, it is also undisputed that after Roache left the employ of DBCI, Short directly managed the entirety of the company's payroll, processing the payroll records, interfacing with the company's accountant, signing paychecks, and making the tax deposits associated therewith. Stipulation ¶¶ 15, 16, 18, 19. With respect to the third factor, it is undisputed that "[b]etween 2001 and 2004, Smith and [Short] met daily, either in person or telephonically, and discussed DBCI's finances including which creditors should be paid." *Id.* ¶ 22. Smith's testimony further confirms the stipulated conclusion.

An examination of the evidence well-illuminates Short's substantial role in the day to day management of DBCI. The Stipulation establishes that between 2001 and 2004 Short "hired DBCI's employees," met daily with Smith, and "discussed finances, including which creditors should be

---

Before the [Administrative Law Judge], the Director clearly stipulated to the findings of fact in the deputy commissioner's award of lifetime benefits. (*See* J.A. at 83 ("[I]f I'm being asked to stipulate to the contents of [the award of benefits] I have no problem with that.").). Therefore, the Director agreed that "as a result of the conditions of coal mine employment [Mr. Richardson] ha[d] contracted a severe chronic respiratory disease diagnosed as coal workers' pneumoconiosis, as that term is defined in the Act and Regulations." (J.A. at 20); *see Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 523 (2d Cir. 1984) ("[A] stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it."). . . . The Director's stipulation and concession are binding on the parties and this court in this appeal. *See Hagan v. McNallen* (*In re McNallen*), 62 F.3d 619, 625 (4th Cir. 1995) (holding that concession before bankruptcy court was binding on appeal); *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (stating that stipulations and admissions are binding on the parties and the court on appeal as well as at trial).

*Richardson v. Director, Office of Workers' Comp. Programs*, 94 F.3d 164, 167 (4th Cir. 1996). *Accord Henze v. Lambertson*, No. 90-2086, 1991 WL 59717, at *1 (4th Cir. Feb. 22, 1991) (unpublished per curiam decision) ("[W]e hold that the district court did err in failing to give binding effect to the parties' stipulation that Betty Henze incurred $6,512.90 in reasonable and necessary medical expenses.").

paid."   The record additionally reflects that Short "signed over 90% of DBCI's checks," and "regularly met with vendors including those for beer, grocery, and cigarettes on behalf of DBCI." *Id.* ¶¶ 21-24.  Short was the main contact at DBCI for the accountant preparing DBCI's payroll checks and payroll statements. *Id.*  ¶¶ 17, 18.  Short's testimony makes plain that, given Smith's substantial absences from the corporate office of DBCI, Short ran the daily convenience store operations of the company. *See also* IRS Exh. 104, Report of Interview for Jacqueline Short, at 3-4 (outlining Short's significant responsibilities in handling the business affairs of DBCI).

Short protests that she never participated in the selection of store sites or the leasing thereto, indicating her lack of managerial control of DBCI.  Her absence from the leasing and site selection function was explained by Smith, who credibly testified that there was no expansion of operations during Short's tenure as Vice President; to the contrary, the company engaged in a substantial contraction of its operations during that time.  Although Short pursued no new business as DBCI's Vice President, her deep entrenchment in the company's existing operations is well supported by the record before the Court.

As to the fifth factor, it is also stipulated that "[b]etween 2001 and 2004, [Short] hired DBCI's employees." Stipulation ¶ 21.  Short emphasized that she did not fire any of DBCI's employees during her time as the company's Vice President.  According to Short, this illustrates a lack of managerial control bestowed upon her by the corporation.  However, the evidence demonstrates that the slowing of DBCI's business did not necessitate the termination of employees.  Rather, during the contraction, DBCI employees were moved from closed locations to those remaining operational according to Smith's testimony.  Smith characterized Short's authority to hire and fire employees as without limitation and including the ability to terminate store managers.  The assertion by Short that she had no authority to hire or fire the company's accountants is nonetheless overwhelmed by the

16

evidence she ran the daily convenience store operations of DBCI, which encompassed the authority

to hire and fire employees.

As to the sixth factor, it is undisputed that Short had check writing authority for DBCI and,

in fact, was the principal check signer for DBCI. *Id*. ¶ 23. This authority, according to Smith, was

without any dollar limitation, and Short admits specifically signing the payroll checks of DBCI. The

Court's review of the evidence presented reveals that, from 2001 to 2003, Short signed checks

totaling at least $544,102.46 on behalf of DBCI. IRS Exh. 118, Sample of Checks from Payroll and

Operating Accounts Signed by Short.

Short argues that she owned no stock in DBCI and was not particularly well-compensated,

contending that this negates her status as a person of authority within DBCI. The absence of stock

ownership in a taxpayer is not determinative of the status of a responsible person. *See Gephart v.*

*United States*, 818 F.2d 469, 474 (6th Cir. 1987) ("We acknowledge that plaintiff is not an officer,

shareholder, or director of The Computer Place. But . . . this is only one of the factors which may

be considered. . . . [T]he court below looked to other factors to determine the degree of financial

authority exercised by plaintiff."). Her compensation as an officer likewise is not a significant factor

in determination of "responsible person" status. *See Blake v. United States*, 534 F. Supp. 223, 224

(D. La. 1982) ("The fact that these officers may not have been compensated for their corporate

activities does not automatically insulate them from liability.").

Much of Short's evidence here was devoted to establishing that, in the two-person hierarchy

of DBCI, Smith as President was the ultimate corporate authority. That Smith was in fact the

President of DBCI and that Short answered to him is certain. Equally certain is the irrelevance of this

in the determination as to whether Short was a "responsible person." As Judge Parker reminds: "an

individual need not have the 'final word' in order to be found a responsible person under section

6672(a).  He or she need only have 'significant control' over the taxpayer's finances." *Winter v.*

*United States*, 196 F.3d 339, 347 (2d Cir. 1999) (internal citations omitted). *See also Secor v. United*

*States*, Case No. IP 90-159-C, 1992 WL 448496, at *3 (S.D. Ind. Nov. 4, 1992) ("Mr. Secor contends,

however, that he did not have the ultimate authority over the expenditure of the Company's funds.

It is not necessary that an individual have the final word as to which creditors should be paid in order

to be subject to liability under [§ 6672].  Rather, it is sufficient that the person have significant

control over the disbursement of funds.").  Indeed, even if Smith had directed Short not to pay the

withholding taxes, Short would not be relieved of her responsibilities.  As Judge Legg has recently

written:

> [A responsible person] cannot be relieved of responsibility for the tax deficiencies by
> claiming, as he does in his amended complaint, that he followed Wright's instructions
> not to pay the trust fund taxes out of fear of being fired.  Following the orders of a
> superior to pay expenses other than payroll taxes is not a defense under § 6672. *See*
> *Brounstein v. United States*, 979 F.2d 952, 955 (3d Cir. 1992) ("Instructions from a
> superior not to pay taxes do not, however, take a person otherwise responsible under
> section 6672(a) out of that category."); *Gephart v. United States*, 818 F.2d 469, 475
> (6th Cir. 1987) ("[A] responsible person follows the directions of a supervisor not to
> pay withholding taxes to the government at his peril."); *see also Plett*, 185 F.3d at
> 221-22 (rejecting responsible person's defense that he did "as he was told").

*Johnson v. United States*, Case No. L-06-350, 2010 WL 170376, at *3 (D. Md. Jan. 14, 2010).

Decisions of the Fourth Circuit Court of Appeals in which the evidence has not supported a

finding of a "responsible person" for the payment of withholding taxes are demonstratively divergent

from the current case at hand.  In *O'Connor v. United States*, a vice president of a company appealed

entry of summary judgment in favor of the IRS concluding no material issue of fact existed as to his

status as a "responsible person."  In reversing, the court relied on several facts that differ dramatically

from those appearing in the case presently at bar:

> None of the other indicia of a responsible person discussed in other cases are present
> in this case.  O'Connor did not control payroll, *White v. United States*, 372 F.2d 513

18

(1967); nor did he decide which bills were paid and which were not paid, *Haffa v. United States*, 516 F.2d 931 (7th Cir. 1975). In addition, he drew no salary, had no office space at Convoi, and did not participate in any of the day-to-day management of the corporation. *See Godfrey v. United States*, 748 F.2d at 1568, 1575 (Fed. Cir. 1984); *Pototzky v. United States*, 8 Cl. Ct. 308 (1985). Although O'Connor had the power to write checks, he asserts that he never exercised this power.

*O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir. 1992). Similarly, in *Turpin v. United States*, 970 F.2d 1344 (4th Cir. 1992), the court found the evidence was sufficient for the jury to conclude there was no showing of liability for the failure to pay withholding taxes. Here again, the evidence was substantially different than that presented in the case at bar:

> Turpin testified at trial that he relied on Powellton to withhold and pay over trust fund taxes and that he was "just a courier" for Powellton "with regard to the [Black Maverick] payroll." Each pay cycle, Turpin would prepare gross payroll checks for Black Maverick's employees and deliver those checks to Powellton. Powellton would calculate the total taxes that were required to be withheld from the employees' wages and then return to Turpin a single check in an amount of the net payroll. Because the payroll check from Powellton to Black Maverick "was for the net amount," Turpin believed "Powellton Coal Company was taking care of" withholding and paying over the trust fund taxes. The reasonableness of his belief that it was not "Black Maverick's responsibility" to "take care of the taxes," argues Turpin, is supported by the fact that he "had no control of anything" at Black Maverick, notwithstanding his corporate offices. *Id.* Rather, he was limited to "producing coal for a man" and using the net payroll check from Powellton "to pay the men." In other words, contends Turpin, Powellton exercised complete control over the finances of Black Maverick, including the payment of trust fund taxes.

*Id.* at 1348 (internal citations omitted). Judge Luttig concluded that the employee in *Turpin* performed only ministerial functions:

> This evidence that Turpin, despite his official titles, was little more than a functionary for Powellton in the financial management of Black Maverick is consistent with other evidence that Turpin performed nothing more than ministerial responsibilities while at Black Maverick. . . .

> In employment matters, Turpin had no authority to hire any member of the United Mine Workers of America (UMWA), but rather had to abide by "a Powellton panel list that [Powellton officials] prepared for" him, *id.* at 132, which identified Powellton as "employer," *id.* at 133, 379. Turpin also followed a seniority list supplied by Powellton when hiring. *See id.* at 133-34, 389-90.

*Id.*[11]   The totality of the circumstances in evidence here convinces the Court that Short was a "responsible person" for the purposes of § 6672 for the withholding taxes of DBCI throughout the tax periods here at issue.

### B. Was Short's Conduct Willful?

The final consideration here requires a determination as to whether Short willfully failed to collect, account for, or remit payroll taxes to the IRS:

> This inquiry focuses on whether Erwin had "knowledge of nonpayment or reckless disregard of whether the payments were being made." *Id.* (quoting *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992)). A responsible person's intentional preference for creditors other than the United States establishes willfulness as a matter of law; such an intentional preference occurs when the responsible person knows of or recklessly disregards an unpaid deficiency. *Id.*; *Turpin*, 970 F.2d at 1347.

*Erwin*, 591 F.3d at 325.  Short became aware of the failure of DBCI to pay its withholding taxes "no later than 2002," Stipulation ¶ 30, which Short clarified in her testimony to have occurred in early 2002 when she returned from maternity leave.

DBCI incurred the majority of its withholding liability for the tax periods of September 30, 2002, through September 30, 2004—after Short became aware of the tax deficiency.  Of $56,240.96 in total unpaid taxes, deficiencies in the amount of $34,433.96 accrued after Short first recognized

---

[11] Judge Motz recognized the highly different circumstances of *O'Connor* in *Erwin*:

> Erwin mistakenly places heavy reliance on *O'Connor*, in which the taxpayer, although a fifty-percent owner of the corporation, did not dictate any of the company's financial decisions or set its financial policy, did not decide which creditors should be paid, did not participate in any of the company's operational management, and did not hire or fire employees. *See O'Connor*, 956 F.2d at 51. Rather, in stark contrast to Erwin's active role in GCAD, the taxpayer in *O'Connor* merely provided the operational cash for the company and received periodic financial reports. *Id.*

*Erwin*, 591 F.3d at 324.

the problem. *Id.* ¶ 31.  Short continued in her managerial duties after thereafter and the company continued its operations, incurring additional withholding tax liability and paying other creditors to remain in business.  The strength of the evidence before the Court convincingly establishes that Short willfully failed to collect, account for, and remit the payroll taxes of DBCI at least for the tax periods of September 30, 2002, until closure of the business in September 2004.

Short argues that her lack of knowledge of the tax delinquencies of DBCI until early 2002 precludes a finding that her failure to pay the withholding taxes due for the period ending December 31, 2001, was a willful omission.[12]  In *Erwin*, the Fourth Circuit Court of Appeals found this

---

[12] During the March 19, 2010, hearing, Short's counsel made reference to caselaw in support of the contention that a debtor's inability to remit taxes that he or she knows are owed should not be considered a willful disregard of the duty to do so if no funds are available to satisfy the debt to the IRS.  At the hearing, counsel was unable to recall the specific case purportedly standing for such a proposition.  On March 22, 2010, Short's counsel filed a letter with the Court intending to provide the Court with a citation to support his comments at the hearing.  The letter points to language found in a case familiar to the Court:

> The Government argues that whether Godfrey had actual knowledge during the October-December period is irrelevant to liability under the statute.  The Government conceded at oral argument that, at the time it wishes to charge Godfrey with actual knowledge of continuing delinquencies . . . there were little or no unencumbered funds to pay the taxes, even if Godfrey had so demanded.  Ferrare testified that if Godfrey had at the time asked him to withhold or pay the taxes, "that would have triggered off another question, saying fine, we're going to pay the taxes then tell me where I get the money from." *The government's position would make failure to order the impossible the equivalent of willfulness.*

*Godfrey v. United States*, 748 F.2d 1568, 1577 (Fed. Cir. 1984) (emphasis added).  The Court derives no meaningful insight from the language presented on behalf of Short.  First, the emphasized passage appears in dicta of the *Godfrey* opinion.  The court in *Godfrey* held that the taxpayer in that case was not a "responsible person" and was therefore under no duty to pay the withholding taxes sought by the IRS.  Given this critical threshold determination, any inquiry into the willfulness of Godfrey's conduct is irrelevant to both the holding in *Godfrey* and to the considerations instantly before this Court.  Second, beyond making cursory reference to the government's position, the *Godfrey* court shed no further light on the question of whether a taxpayer's insufficiency of funds to pay the IRS may negate the element of willfulness under the Internal Revenue Code.  The Court will not draw uninformed inferences about the *Godfrey*

reasoning to be without merit. Having considered the chronological relationship between the taxpayer's first awareness of withholding tax arrears and his subsequent failure to remit satisfying payments, Judge Motz concluded that the taxpayer's willfulness was evidenced by the conduct in which he engaged after learning of the deficiencies:

> Even assuming, however, that Erwin did not act willfully *prior* to learning of the full extent of the tax deficiencies in August 1999, his conduct *after* that point unquestionably evidences willfulness as a matter of law. During the third quarter of 1999, GCAD paid just a fraction of its payroll tax liability. Although Erwin and Coggin each made capital contributions to cover the deficiency in December 1999, GCAD still owed over $100,000 for that quarter alone and had not satisfied deficiencies from 1998 and the first two quarters of 1999. The record does not conclusively reveal the *extent* of Erwin's actual knowledge at this point in time, but certainly demonstrates that by that time he was on notice that GCAD owed substantial payroll taxes to the IRS. Yet Erwin and his partners continued to rely on the Light brothers to address the problem for several more months. Erwin's failure to assess and remedy the payroll tax deficiencies immediately upon learning of their existence in August 1999 constitutes unreasonable willful conduct. *Cf. id.* at 1350 (noting the relevance of responsible person's immediate action to address deficiencies upon learning of them). This is particularly so given that, at Erwin's direction, GCAD paid other creditors during this period. Thus, Erwin is liable for any outstanding third-quarter 1999 deficiencies. *See Plett*, 185 F.3d at 219.

*Erwin*, 591 F.3d at 326. The court also concluded that the failure to rectify the tax payment deficiency after the assumed date of knowledge of August 1999 exposed the taxpayer to liability for earlier unpaid quarters:

> Moreover, following the lead of every other circuit to consider the question, we adopt the rule that when a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes. *See, e.g.*, *Thosteson*, 331 F.3d at 1300-01; *United States v. Kim*, 111 F.3d 1351, 1357 (7th Cir. 1997); *Honey v. United States*, 963 F.2d 1083, 1089 (8th Cir. 1992); *Mazo*, 591 F.2d at 1157. Pursuant to this rule, as of August 1999, Erwin had a duty to use all unencumbered funds to reduce GCAD's tax liability from the prior quarters.

*Id.* Accordingly, the *Erwin* court held that by paying other creditors from gross receipts after August

---

court's reasoning in the absence of such illumination.

1999 while failing to pay the IRS, Erwin willfully failed to remit the required payroll taxes for the

fourth quarter of 1998 and the first three quarters of 1999. *Id.*

The Seventh Circuit Court of Appeals has elaborated on the responsible person's duty to

commit all unencumbered funds to pay back taxes upon becoming aware that such taxes are in

arrears:

> Even if a "responsible person" is unaware that withholding taxes have gone unpaid
> in *past* quarters, it is settled law that a responsible person who *becomes* aware that
> taxes have gone unpaid in past quarters in which he was also a responsible person, is
> under a duty to use all "unencumbered funds" available to the corporation to pay
> those back taxes.  This was first established as the law of this circuit in 1979 in the
> case *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir. 1979) (citing *Mazo v. United
> States*, 591 F.2d 1151 (5th Cir. 1979)).  *See also Honey v. United States*, 963 F.2d
> 1083, 1089 (8th Cir. 1992). This duty extends not only to funds available to the
> corporation at the time the responsible person becomes aware, but also to any
> *unencumbered funds acquired thereafter. Garsky*, 600 F.2d at 91.  If the responsible
> person fails to use such unencumbered funds to satisfy the past unpaid liability, he is
> deemed personally liable for the taxes that went unpaid in the past while he was
> responsible.  The responsible person deemed liable for the unpaid liability of past tax
> quarters is considered to have "willfully" failed to pay overt the taxes for those past
> quarters, even though he was unaware at that time that the taxes were going unpaid.
> *Id.*  The one limitation on this is that the person is only liable to the extent that
> "unencumbered funds" are available or acquired after the time in which that person
> becomes aware. See *Huizinga v. United States*, 68 F.3d 139, 145 (6th Cir. 1995)
> (affirming grant of summary judgment for taxpayer where funds available to satisfy
> liability were encumbered by trust).

*United States v. Kim*, 111 F.3d 1351, 1357-58 (7th Cir. 1997).

Here it is undisputed that DBCI continued its operations and favored other creditors by paying

them in order to remain in business after the discovery of the tax deficiencies by Short.[13]  It is also

---

[13] Although not expressly raised by Short, the Fourth Circuit Court of Appeals rejected
the necessity of payment of other creditors as constituting a defense to a conclusion of willful
failure to pay withholding taxes:

> Erwin raises a putative "reasonable cause" defense, arguing that GCAD had to use
> gross receipts to pay rent and vendors in order to stay operational.  Courts that have
> recognized this defense have limited it to situations in which circumstances outside

beyond question that unencumbered funds sufficient to pay the tax liability of DBCI for the period

of December 31, 2001, came into the company subsequent to the discovery of the withholding tax

liability by Short. *See* IRS Exhs. 110, DBCI's Balance Sheet and Operating Statement for the month

and year ending December 31, 2001; 112, DBCI's Balance Sheet and Operating Statement for the

year ending December 31, 2003; 115, DBCI's Balance Sheet and Operating Statement for the month

and seven-month period ending July 31, 2004; and 118, Sample of Checks from Payroll and

Operating Accounts Signed by Short.  Accordingly, under the Fourth Circuit's governing precedent

as established in *Erwin*, the Court must also conclude that Short willfully failed to pay the

withholding tax liability of DBCI for the period ending December 31, 2001, and all subsequent tax

periods until DBCI ceased operations in September 2004.

## IV. Conclusion

The evidence here establishes that Short was a "responsible person" for the payment of

withholding taxes by DBCI and that she willfully failed to collect, account for, and remit the

withholding taxes owed by DBCI for the tax periods and in the amounts set forth in paragraph 31 of

the Stipulation.  Accordingly, the Short Objection should be overruled.  As the Plan fails to provide

for the payment of the liability of Short to the IRS, the IRS Objection to confirmation should be

---

a taxpayer's control have thwarted his reasonable efforts to protect trust funds, and have not applied it in situations where the taxpayer made a conscious decision to pay other creditors. *See, e.g.*, *Thosteson*, 331 F.3d at 1301 (citing *Logal v. United States*, 195 F.3d 229, 233 (5th Cir. 1999)); *see also Greenberg*, 46 F.3d at 244 ("It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States."). Thus, even were we to conclude that a "reasonable cause" defense to § 6672 liability exists, such a defense would not protect Erwin under these facts.

*Erwin*, 591 F.3d at 326.

sustained and confirmation of the Plan should be denied.

A separate Order will be entered.

The Clerk is ORDERED to forward a copy of this Memorandum Opinion to Allie C. Yang-Green, counsel for the IRS; Gregory D. Stefan, Assistant United States Attorney; Philip R. Boardman, counsel for Short; and to R. Clinton Stackhouse, Jr., Chapter 13 Trustee.

**Entered this 22nd day of April, 2010, in the Eastern District of Virginia.**

Stephen C. St. John
United States Bankruptcy Judge

25